UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-21341-Civ-COOKE/TORRES

MID-CONTINENT CASUALTY
COMPANY, a foreign corporation,

    Plaintiff,

vs.

ARPIN AND SONS, LLC,
A Florida Limited Liability
Company and LEE ELLIS
BLUE, an individual,

    Defendants.

_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

    This is an action for declaratory relief under 28 U.S.C. § 2201 to determine the scope of Plaintiff Mid-Continent Casualty Company's ("MCC") obligations, if any, under a commercial general liability insurance policy (the "Policy") to defend and/or to indemnify Defendant Arpin and Sons, LLC ("Arpin") against a negligence lawsuit Defendant Lee Ellis Blue filed against Arpin in the Circuit Court of Miami-Dade County, Florida (the "state-court action").[1] I have jurisdiction under 28 U.S.C. § 1332.

    Pending is MCC's Motion for Summary Judgment. (ECF No. 44). I have reviewed the Motion, the parties' supporting and opposing briefs, the record, and the relevant legal authorities. For the reasons that follow, I grant the Motion.

### BACKGROUND

    The state-court action arose out of a construction project at 1180 NW 99th Street in Miami-Dade County, Florida (the "Project"). (ECF No. 56-5 ¶ 9). According to MCC, Arpin entered into a verbal agreement with the owner of the property, Faith Deliverance Center, Inc. of Broward ("FDC"), to act as general contractor for the Project. (ECF No. 45 ¶ 4). MCC asserts that as general contractor, Arpin was responsible for worksite safety and compliance during the Project and had a duty to supervise the construction activities in connection therewith. (*Id.*).

---

[1] *Blue v. Arpin and Sons, LLC*, No. 13-034080-CA-01 (Fla. Cir. Ct. filed Oct. 29, 2013).

Arpin describes its agreement with FDC, and its responsibilities with respect to the Project, differently. It claims that FDC asked Arpin to "procure the building permits related to the [P]roject, because it could not secure the permits on its own" due to the fact that it did not have the necessary general contractor license and insurance certificates. (ECF No. 57 at 3). Arpin asserts that it was "acting solely as a volunteer while securing the permits," "was never paid for the services," and that "no obligation other than to secure permits . . . was created by the verbal agreement between FDC and Arpin." (*Id.*). Arpin also denies that it was the Project's general contractor. (*Id.*).

In any event, on July 26, 2010, Blue, an FDC employee (ECF No. 45 ¶ 36), was working on the Project when he was electrocuted, causing him severe injuries including the amputation of his arms (the "incident"). (*Id.* ¶ 4). The day after the incident, while Blue was in the hospital, Arpin initiated a workers' compensation claim on Blue's behalf with its insurer, Builders Insurance Group/Vinings Insurance Company ("Vinings").[2] (ECF 58-4 at 23-24). When Vinings' investigation revealed that FDC did not carry workers' compensation insurance, Vinings concluded that Arpin was the Project's general contactor and began making medical and indemnity payments to Blue and his medical providers under its policy (ECF No. 45 ¶¶ 27-32).[3]

On October 21, 2013, Blue filed his original Complaint ("OC") against Arpin (among others) alleging that it was negligent in performing its duties as the Project's general contractor. (ECF No. 56-1). Blue filed a First Amended Complaint ("FAC") (ECF No. 56-2) on January 7, 2014, and then a Second Amended Complaint ("SAC") (ECF No. 56-5) in January 2016.[4] Upon the filing of that pleading, MCC hired counsel to defend Arpin in the state-court action, subject to a reservation of rights. (ECF No. 45 ¶ 6). Arpin contends that the Policy required

---

[2] Blue alleges that unbeknownst to him, Arpin falsely represented to Vinings that Blue was an Arpin employee, and that his injuries occurred during the course and within the scope of his employment. (ECF 58-4 at 43-49).

[3] The indemnity payments to Blue – beginning on December 20, 2010 and continuing through November 22, 2016 – included temporary total payments, penalty payments, interest payments, permanent total payments and supplemental payments. (ECF No. 45-2 at 81-83.) These payments totaled $124,358.45. (*Id.* at 83.). The payments made to Blue's medical providers – beginning on August 6, 2010 and continuing through November 30, 2016 – totaled $289,965.62. (*Id.* at 78.). Blue has not returned any of these payments. (*Id.* at 83-84).

[4] I hereinafter refer to the OC, FAC, and SAC collectively as the "state-court complaints."

MCC to provide it with a defense at the outset of the state-court action, and that MCC must indemnify it for the fees and costs it incurred defending the action in the meantime. (ECF No. 57 at 1-2). Arpin further argues that MCC must indemnify Arpin for "any judgment, regardless of the amount, that might be entered in favor of Blue and against Arpin." (*Id.* at 2).

MCC's Policy with Arpin covered the period from January 7, 2010 through January 7, 2011, and thus was effective on the day of incident. (ECF No. 45 at 1 n.1). It provided Arpin with commercial liability coverage for claims involving bodily injuries caused by an "occurrence," subject to certain exclusions. (ECF No. 7-1 at 7 ¶ B.1). MCC invokes two of those exclusions to argue that the Policy does not cover Blue's claim. The exclusions provide:

> **2. Exclusions**
>
> This insurance does not apply to . . . .
>
> **d. Workers' Compensation And Similar Laws**
>
> Any obligation of the insured under any workers' compensation, disability benefits or unemployment compensation law or any similar law.
>
> **e. Employer's Liability**
>
> "Bodily injury" to:
>
> **(1)** An "employee" of the insured arising out of and in the course of:
>
> **(a)** Employment by the insured; or
>
> **(b)** Performing duties related to the conduct of the insured's business; or
>
> **(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.
>
> This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.
>
> This exclusion does not apply to liability assumed by the insured under an "insured contract".

(ECF No. 7-1 at 16 ¶¶ 2.d-e).

MCC argues that given these exclusions, the Policy does not require it to defend or to indemnify Arpin in the state-court action. It filed this action on April 14, 2016 seeking a declaratory judgment to that effect. (ECF No. 1).

3

## STANDARD OF REVIEW

Summary judgment "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997) (quoting Fed. R. Civ. P. 56(c)) (internal quotations omitted); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). Thus, the entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.*

Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted).

"A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon*, 196 F.3d at 1358. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). When deciding whether summary judgment is appropriate, "the evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party." *Bush v. Houston County Commission*, 414 F. App'x 264, 266 (11th Cir. 2011).

## DISCUSSION

An insurance policy typically requires an insurer not only to indemnify its insured against any damages award based on a claim the policy covers, but also to defend the insured

in any action against it to recover those damages. *See EmbroidMe.com, Inc. v. Travelers*, 845 F.3d 1099, 1107 (11th Cir. 2017). MCC does not dispute that it has a general duty to defend and to indemnify Arpin against any claim for "bodily injury" that the Policy covers. It contends, however, that the Policy does not cover Blue's claim against Arpin because the Policy's workers' compensation and employer's liability exclusions position the claim outside the scope of coverage.[5] Underpinning that argument is MCC's assertion that Arpin was Blue's "statutory employer" at the time of the incident, an assertion both Blue and Arpin dispute.

Under Florida law,[6] a contractor who sublets part of its work to a subcontractor develops a statutory employment relationship with the employees of that subcontractor. *See id.* at 1322. The concept of a "statutory employee" derives from Florida's Workers' Compensation Law, Fla. Stat. §§ 440.01 *et seq. See Florida Ins. Guar. Ass'n, Inc. v. Revoredo*, 698 So. 2d 890, 891-92 (Fla. Ct. App. 2006). The Act states, in relevant part:

> In case a contractor sublets any part or parts of his or her contract work to a subcontractor or subcontractors, all of the employees of such contractor and subcontractor or subcontractors engaged on such contract work shall be deemed to be employed in one and the same business or establishment, and the contractor shall be liable for, and shall secure, the payment of compensation to all such employees, except to employees of a subcontractor who has secured such payment.

Fla. Stat. § 440.10(1)(b). The Florida Supreme Court has explained that the "effect of section 440.10 is that where a subcontractor performing part of the work of a contractor fails to secure payment of compensation, the contractor is liable for same." *Motchkavitz v. L.C. Boggs Indus., Inc.*, 407 So. 2d 910, 912 (Fla. 1981).

"Under Florida law, '[s]tatutory employees have been treated identically to actual employees in relation to standard employee exclusion clauses.'" *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1322-23 (11th Cir. 2014) (citation omitted). In *Revoredo*, Florida's Third

---

[5] Florida courts regularly enforce both workers' compensation exclusions and employer's liability exclusions. *See, e.g., Greathead v. Asplundh Tree Expert Co.*, 473 So. 2d 1380, 1383 (Fla. Ct. App. 1985) ("Florida case law suggests . . . the purpose of exclusions such as [the workers' compensation exclusion] is to exclude coverage of those employees protected by the workers' compensation law, whereas the language of [the employer's liability exclusion] acts to exclude liability for injury to employees generally."). Thus, "[a]lthough the two [exclusions] may overlap to a certain degree, they are not to be read together to exclude only those employees protected by workers' compensation." *Id.*

[6] Florida law applies to this action because MCC bases subject matter jurisdiction on diversity. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

District Court of Appeals reasoned:

> The logic in the exclusion from coverage of both types of employees is simple and compelling: the only coverage intended, and for which the premium has been paid, is the liability of the insured *to the public*, as distinguished from liability to the insured's employees whether or not they are protected by the workers' compensation law.... [the statute] does not make the statutory employer-employee relationship contingent on the securing of workers' compensation for the employee.

*Revoredo*, 890 So. 2d at 892 (emphasis added); *see also Amerisure Ins. Co. v. Orange & Blue Const., Inc.*, 545 F. App'x 851, 855 (11th Cir. 2013) ("Unlike worker's compensation insurance or employer's liability insurance, which exist to provide employers with coverage for injuries that occur to employees during the scope of employment, the sole purpose of commercial general liability insurance is to provide coverage for injuries that occur to the public-at-large.").

Thus, Florida law requires that I construe the Policy's workers' compensation exclusion and employer's liability exclusion as applying to Arpin's actual *and* statutory employees. Having resolved that question of contract interpretation, I next consider whether MCC has duties under the Policy to defend and to indemnify Arpin in the state-court action. It is well settled under Florida law that an insurer's duty to defend an insured is separate and distinct from the question whether it has a duty to indemnify the latter against the imposition of damages.[7] *Mid–Continent Cas. Co. v. Am. Pride Bldg. Co., LLC*, 601 F.3d 1143, 1148 (11th Cir. 2010); *First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co.*, 361 So. 2d 743, 745 (Fla. Ct. App. 1997). I therefore address each duty in turn.

### A. Duty to Defend

Under Florida law, an insurance provider's duty to defend an insured party "depends *solely* on the facts and legal theories alleged in the pleadings and claims against the insured."[8] *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1275 (emphasis added) (internal

---

[7] "Under Florida law, an insurance policy is treated like a contract, and therefore ordinary contract principles govern the interpretation and construction of such a policy." *Pac. Emp'rs Ins. Co. v. Wausau Bus. Ins. Co.*, 2007 WL 2900452, at *4 (M.D. Fla. 2007) (citing *Graber v. Clarendon Nat'l Ins. Co.*, 819 So. 2d 840, 842 (Fla. Ct. App. 2002)). Further, "[u]nder Florida law, insurance contracts are construed according to their plain meaning." *Garcia v. Fed. Ins. Co.*, 473 F.3d 1131, 1135 (11th Cir. 2006). The "terms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties – not a strained, forced or unrealistic construction." *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 736 (Fla. 2002) (quotation omitted).

quotation omitted). The duty to defend "arises when the relevant pleadings allege facts that 'fairly and potentially bring the suit within policy coverage.'" *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir.1995) (internal quotation omitted); *see U.S. Fire Ins. Co. v. Hayden Bonded Storage Co.*, 930 So.2d 686, 691 (Fla. Ct. App. 2006). "Thus, an insurer is obligated to defend a claim even if it is uncertain whether coverage exists under the policy." *Mid–Continent Cas. Co. v. Am. Pride Bldg. Co., LLC*, 601 F.3d 1143, 1149 (11th Cir.2010) (quoting *First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co.*, 695 So.2d 475, 476 (Fla. Ct. App. 1997)).

But "if the pleadings show that there is no coverage or that a policy exclusion applies to bar coverage, the insurer has no duty to defend." *Goldberg v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 143 F. Supp. 3d, 1283, 1293-94 (S.D. Fla. 2015). If an insurer seeks to avoid a duty to defend because of a policy exclusion, then it "has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion, and are subject to no other reasonable interpretation." *Luhman v. Covington Specialty Ins. Co.*, 2017 WL 850178, at *5 (S.D. Fla. 2017) (citation omitted).

Here, each state-court complaint includes allegations that trigger the Policy's workers' compensation and employer's liability exclusions. The OC and FAC each allege, *inter alia*:

- "ARPIN AND SONS is a company owned and operated by ARPIN. At all material times hereto, ARPIN held current and active certified general contractor licenses under the State of Florida Department of Professional Regulation." (ECF No. 56-1 ¶ 16; ECF No. 56-2 ¶ 16).
- "In approximately 2007, once all of the design issues were resolved with the County, ARPIN AND SONS entered into a verbal agreement with [FDC owner and operator, Pastor Dr. James] Rorie and [FDC] to build the fourteen (14) unit senior-citizen center

---

[8] Florida law recognizes rare circumstances where a court may consider evidence extrinsic to the underlying complaint when determining the duty to defend. For example, in *Higgins v. State Farm Fire & Cas. Co.*, 894 So. 2d 5, 10 n.2 (Fla. 2005), the Florida Supreme Court identified "some natural exceptions" to the principal that the obligation to defend is determined solely by the claimant's complaint "where an insurer's claim that there is no duty to defend is based on factual issues that would not normally be alleged in the complaint." The Eleventh Circuit has cautioned, however, that this departure from the general practice in Florida appears only in "exceptional cases in which courts have crafted an equitable remedy when it is manifestly obvious to all involved that the actual facts placed the claims outside the scope of coverage." *First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 F. App'x 777, 786 (11th Cir. 2008). Here, Blue's state-court complaints contain allegations sufficient to position his claim against Arpin outside the scope of the Policy's coverage. Consideration of extrinsic evidence is therefore unnecessary.

- pursuant to which ARPIN AND SONS would act as the General Contractor and ARPIN would procure all building permits related to [FDC]." (ECF No. 56-1 ¶ 17; ECF No. 56-2 ¶ 17).

- "The scope of ARPIN AND SONS' work was to be a general contractor responsible for the building of the fourteen (14) units known as the senior citizens center, complete road development, infrastructure, and to perform all duties as a General Contractor on the job site." (ECF No. 56-1 ¶ 18; ECF No. 56-2 ¶ 18).

- "From 2007 until approximately 2008, ARPIN, acting as the civil engineer and qualifier for the construction project, underwent a protracted permitting process. On or about November 12, 2008, the building permits were issued to ARPIN as the qualifier and ARPIN AND SONS as General Contractor." (ECF No. 56-1 ¶ 19; ECF No. 56-2 ¶ 19).

- "ARPIN was the General Contractor . . . ." (ECF No. 56-1 ¶ 35; ECF No. 56-2 ¶ 35).

- "On the date of the incident, ARPIN, as the Qualifier, and ARPIN AND SONS, as the General Contractor, were not present to supervise the work or to ensure the safety of the workers and others present at the job site." (ECF Nos. 56-1 ¶ 38; ECF No. 56-2 ¶ 38).

Likewise, Blue's claim for relief against Arpin in the OC and FAC relies entirely on the breach of duties Arpin allegedly owed Blue as the Project's general contractor. (ECF Nos. 56-1 ¶¶ 44-51; ECF No. 56-2 ¶¶ 44-51).

Although framed differently, Blue's SAC (ECF No. 56-5) also alleges that Arpin was the Project's general contractor on the day of the incident. Specifically, it states:

- "In approximately 2007, once all of the design issues were resolved with the County, ARPIN AND SONS entered into a verbal agreement ("Agreement") with Pastor Rorie and [FDC] regarding fourteen (14) unit Senior Citizens pursuant to which ARPIN AND SONS would procure all building permits related to the [FDC] construction project at the Subject Location." (ECF No. 56-5 ¶ 14).

- "The scope of ARPIN AND SONS' work was to pull all required building permits, thereby making it the General Contractor of record responsible for worksite safety and compliance during construction of the fourteen (14) unit Senior Citizens Center, and to perform all associated duties as a General Contractor on the worksite." (*Id.* ¶ 15).

- "From 2007 until approximately 2008, Donald Arpin, acting as the civil engineer and Qualifier for the [Project], navigated the protracted permitting process. On or about November 12, 2008, the building permits were issued to Donald Arpin as the Qualifier and ARPIN AND SONS as the General Contractor." (*Id.* ¶ 16).

8

Moreover, as with the OC and FAC, Blue's claim for relief against Arpin in the SAC relies entirely on the breach of duties Arpin allegedly owed Blue as the Project's general contractor. (ECF Nos. 56-5 ¶¶ 40-47).

The three state-court complaints thus unequivocally allege Arpin was the Project's general contractor on the day of the incident. If that was the case, Arpin was "legally obligated to secure the payment of medical and disability benefits for any employee who [was] injured at work," *Slora v. Sun %2Cn Fun Fly-In, Inc.*, 173 So. 3d 1099, 1102 (Fla. Ct. App. 2015) – i.e., Arpin was the statutory employer of contractors working on the Project, including Blue.[9] Blue's allegations against Arpin are therefore "cast solely and entirely" within the Agreement's workers' compensation and employer's liability exclusions, and "are subject to no other reasonable interpretation." *Luhman*, 2017 WL 850178, at *5. Accordingly, MCC has no duty under the Policy to defend Arpin in the state-court action.

### B. Duty to Indemnify

Unlike the duty to defend, which generally is triggered by the allegations in the underlying complaint, an insurance company's duty to indemnify an insured party "is narrower and is determined by the underlying facts adduced at trial or developed through discovery during the litigation." *U.S. Fire Ins. Co. v. Hayden Bonded Storage Co.*, 930 So.2d 686, 691 (Fla. Ct. App. 2006); *see also Hagen v. Aetna Cas. and Sur. Co.*, 675 So.2d 963, 965 (Fla. Ct. App. 1996) ("Regardless of the allegations of the complaint, it is the underlying facts that determine the duty to indemnify."). In other words, to determine whether there is a duty to indemnify, a court looks beyond the facts alleged in the state-court complaint. *Stephens*, 749 F.3d at 1324; *see Victoria Select Ins. Co. v. Vrchota Corp.*, 805 F. Supp. 2d 1337, 1343 (S.D. Fla. 2011) ("Typically, evidence extrinsic to the pleadings is needed to evaluate the duty to

---

[9] The fact that the OC, FAC and SAC each allege that FDC was Blue's actual employer on the date of the incident does not change the analysis. (ECF No. 56-1 ¶ 35; ECF No. 56-2 ¶ 35; ECF No. 56-5 ¶ 28) The court's decision in *Orama v. Dunmire*, 552 So. 2d 924 (Fla. Ct. App. 1989), is instructive on this point. In *Orama*, the court held that a statutory employer-employee relationship existed within the meaning of § 440.10 where an injured contractor hired by the owner of a construction project sought workers' compensation benefits from the general contractor. *Id.* at 925-26. The court found that the general contractor "assumed the legal position of general contractor for the job" by using his license to obtain the permits to build the building. *Id.* at 926. The fact that the general contractor did not actually hire the injured contractor was irrelevant. *Id.*; *see also, e.g.*, *Lache v. Bal Harbour Hotel, LLC*, 104 F. Supp. 3d 1379, 1383 (S.D. Fla. 2015) (where an entity "assumes the legal status of a contractor, it becomes the 'statutory employer' of the subcontractor's employees").

indemnify.").

As noted, the lynchpin of MCC's argument is that Arpin was the Project's general contractor. "To be a contractor under [section 440.10(1)], one must have a contractual obligation to perform some work for another." *Miami Herald Publ'g v. Hatch*, 617 So.2d 380, 382 (Fla. Ct. App. 1993). Arpin argues that its verbal agreement with FDC created no contractual obligations because Arpin did not receive consideration for doing FDC the "favor" of securing building permits for the Project. *See* Restatement (Second) of Contracts § 17 (1981) ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."). But Arpin did, in fact, receive something for its efforts: a tax credit letter for $12,337, which FDC provided in response to an invoice and "as an acknowledgement of [Arpin's] work for [FDC] in the construction of the apartments at . . . NW 99 St.," including "services, insurances, licenses and direct/indirect overhead, and on-site supervision."[10] (ECF No. 60 Ex. E). Such a benefit constitutes valuable consideration.[11] *See United States v. Linn*, 40 U.S. 290, 314 (1841) ("A benefit to the promisor . . . constitutes a good consideration."); *see also, e.g.*, *First Nationwide Bank v. United States*, 431 F.3d 1342, 1349 (Fed. Cir. 2005) (tax benefits constitute valuable consideration). MCC has therefore established there was a contract between Arpin and FDC. *See St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004) ("[A] party who asserts an oral contract must prove its existence by a preponderance of the evidence.").

Notwithstanding its contract with FDC, Arpin maintains that it was not the Project's general contractor. It asserts it never agreed to do anything more for FDC than to acquire the required construction permits. MCC, however, cites testimony from two key witnesses that it argues proves otherwise:

---

[10] Blue argues I should disregard the tax credit letter because MCC cites to it for the first time in its Reply brief. That argument is misplaced. The letter is not "new evidence"– it was marked as an exhibit and discussed during at least one witness's deposition. (ECF No. 58-5 at 85-87). A court ruling on a motion or summary judgment must consider the entire record in the case, not just those pieces of evidence that the parties have singled out for attention. *See Clinkscales v. Chevron USA, Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987).

[11] Blue makes much of the fact that the tax credit letter and underlying invoice are dated approximately three months after the incident. The letter itself states, however, that it covers all work Arpin performed in connection with the Project, including work performed before the incident. (ECF No. 60-5).

**Testimony of Donald Arpin, Arpin's Corporate Representative**

- Arpin was initially engaged at the Project by Donald Nystrom, a member and elder at FDC who introduced Arpin to Rorie. (ECF No. 45-1 at 10-11.). Under Arpin's verbal agreement with Nystrom, Arpin's role at the Project was that of general contractor "on record" and construction manager "with very limited supervision." (*Id.* at 21, 24, 99, 103).

- Arpin signed numerous permit and plan revision applications that Miami-Dade County required from the general contractor for work on the Project to proceed. (*Id.* at 45-56, Ex. 2).

- Arpin provided proof of worker's compensation insurance for the Project, which Miami-Dade County required for work on the Project to proceed. (*Id.* at 30-31)

- Arpin signed a hold harmless agreement, which Miami-Dade County required when a subcontractor/contractor was replaced. (*Id.* at 67-68; Ex. 4 at 8).

- Arpin recommended contractors for certain aspects of the Project's construction, e.g., installation of water heaters. (*Id.* at 69-70)

- Arpin bore "limited" responsibility for safety on the Project. (*Id.* at 79).

- Arpin bore responsibility for providing workers' compensation coverage to workers, such as Blue, who were injured at the Project. (*Id.* at 91-93).

- Arpin issued checks to Blue for the specific purpose of enabling Blue to secure worker's compensation benefits.[12] (*Id.* at 84, 88-90, Exs. 5, 6).

- Arpin issued an invoice to FDC on October 8, 2010 requesting credit for a tax deduction in the amount of $12,337, which reflected the value of Arpin's services in connection with the Project and included the cost of insurance and direct/indirect overhead. (*Id.* at 32, 35-37, Ex. 1).

**Testimony of Dr. James Rorie, Corporate Representative of FDC**

- FDC entered into a verbal agreement with Arpin, wherein Arpin agreed to pull the permit for the Project and oversee the work performed thereunder. (ECF No. 45-6 at 26-28).

- As a prerequisite for obtaining the permit pulled by Arpin, FDC

---

[12] In response to an MCC subpoena of records related to Branch Banking & Trust Company's ("BB&T") Arpin account, BB&T produced a check Arpin issued to Blue in the amount of $452.75. (ECF No. 45-3 at 9). The check is dated June 4, 2010 – more than a month before the incident – and contains a deposit stamp dated August 10, 2010. (*Id.*). The check was endorsed with the name "Lee Blue." (*Id.*).

- provided the building department with proof of Arpin's worker's compensation insurance. (*Id.* at 66-68). Accordingly, FDC's understanding was that Arpin's insurance would provide coverage for persons injured at the jobsite. (*Id.*)

- In addition to pulling the permit and overseeing the work at the Project, Arpin also selected contractors who performed electrical work at the site and signed off on paperwork required by the county. (*Id.* at 34-36, 112-114).

- FDC undertook the supervision obligations that were attendant to Arpin's pulling of the permit. (*Id.* at 87.) But Arpin received continual reporting about the progress of the project from Donald Nystrom, a representative of FDC who visited the Project on a regular basis. (*Id.* at 16, 54, 107).

Thus, the testimony shows: (1) Arpin and FDC agreed that Arpin would secure building permits for the Project; (2) Arpin and FDC agreed that Arpin would be the Project's general contractor "on record"; (3) Arpin fulfilled several responsibilities as the Project's general contractor, many of which required that it hold a general contractor's license; (4) Arpin assumed at least partial responsibility for safety on the Project; (5) Arpin provided workers' compensation coverage to workers on the Project, including Blue; and (6) Arpin received a tax benefit from FDC which reflected the value of Arpin's services in connection with the Project. Arpin and Blue point to nothing in the record that calls these facts into question.

In light of the above, I am persuaded that Arpin was the Project's general contractor and was, by extension, Blue's statutory employer on the date of the incident. Accordingly, the Policy's workers' compensation and employer's liability exclusions apply, and the incident fell outside the scope of the Policy's coverage. MCC therefore has no duty to indemnify Arpin for any judgment Blue might obtain against Arpin in the state-court action.

## CONCLUSION

It is, therefore, **ORDERED** and **ADJUDGED** that Plaintiff Mid-Continent Casualty Company's Motion for Summary Judgment (ECF No. 44) is **GRANTED**. The Clerk shall **CLOSE** this case. All pending motions, if any, are **DENIED** *as moot*.

**DONE** and **ORDERED** in chambers at Miami, Florida, this 22nd day of May 2017.

_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of Record*